

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA

-against-

ALFREDO RODRIGUEZ,

                  Defendant.
-----------------------------------------------------------------X

MEMORANDUM & ORDER

18-CR-444

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Alfredo Rodriguez has been indicted on two counts: (1) conspiring to distribute a Schedule I controlled substance analogue and (2) attempting to possess with intent to distribute a Schedule I controlled substance analogue, both in violation of 21 U.S.C. § 841(a)(1). (Indictment (Dkt. 13) ¶¶ 1-2.) He now moves (1) to dismiss the indictment against him on the basis that the definition of "controlled substance analogue" in the Controlled Substance Analogue Enforcement Act of 1986 (the "Analogue Act") is unconstitutionally vague as applied to him; (2) to compel the Government to provide him with a bill of particulars; and (3) to suppress statements he made that were allegedly obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Def. Mot. (Dkt. 26); Def. Mem. in Support of Mot. ("Def. Mem.") (Dkt. 26-1) at 1; see Def. Reply (Dkt. 32) at 5-8 (moving for a bill of particulars).) For the following reasons, Defendants' motions are DENIED.

I.     BACKGROUND

A. Facts

Defendant is an adult male who has previously been convicted of two felonies, four other drug offenses, and spent "a few years" in jail. (Aug. 10, 2018 Hr'g Tr. ("Hr'g Tr.") (Dkt. 28-1) at 13:24-14:18.) In July 2018, Defendant allegedly ordered a package (the "Subject Package") to be shipped from China to a residence in Jamaica, New York (the "Residence"). (Compl. (Dkt.

1

1) ¶¶ 2, 5.) The Subject Package was addressed to a recipient who was not Defendant and whose name was misspelled. (Id.) The Subject Package arrived in the United States on or about July 23, 2018, whereupon United States law enforcement personnel intercepted it and determined through laboratory testing that it contained about 2,013 grams of N-Ethylpentylone,[1] which is allegedly a Schedule I controlled substance analogue, as defined in 21 U.S.C. § 802(32). (Id. ¶¶ 2, 5.) Law enforcement replaced the drug with a sham product that resembled N-Ethylpentylone. On August 2, 2018, a United States Postal Inspector attempted to deliver the package to the Residence. (Id. ¶ 3.) Outside of the Residence, the Inspector encountered Defendant, who indicated that he could accept delivery of the parcel and that the recipient whose name was on the package was asleep inside. (Id.) The Inspector indicated that the intended recipient should sign for the package. (Id.) Defendant summoned the recipient, who signed for the parcel and took it inside the Residence. (Id.)

Law enforcement arrested Defendant outside of the Residence. (Id. ¶ 4.) The Government alleges that Defendant was read his <u>Miranda</u> rights at the time of his arrest. (Id.) Defendant was then transported to a law enforcement office at John F. Kennedy International Airport ("JFK") in Queens, New York, where he was interviewed by two Homeland Security Investigations ("HSI")[2] Special Agents, Sheldon Corchado[3] and Jim Abel. (Id.; <u>see</u> Video of

---

[1] N-Ethylpentylone is a stimulant that resembles and is sold as "molly," a nickname for methylenedioxymethamphetamine ("MDMA"). (Compl. ¶ 5.) Molly is used as a catchall term for similar substances. (See id.)

[2] HSI is an organization within the United States Department of Homeland Security. (See Compl. at p. 1.)

[3] Defendant's briefing spells this person's last name as "Coronado" (Def. Mem. at 3-4), but the complaint and this person's affidavit indicate that his name is in fact "Corchado" (Compl. at p. 1; Aff. of Sheldon Corchado (Dkt. 10) at 1.)

2

Aug. 2, 2018 Interview ("Video") (undocketed) at 0:30-0:40 (where Corchado and Abel introduce themselves to Defendant).) HSI recorded a video of the interview.[4] (Video.)

At the beginning of the interview, Defendant was led into a room and sat in a chair facing the camera. (Video at 0:00-0:25.) His hands were behind his back as he walked in, but he was not handcuffed or physically restrained. (Id.) Corchado then introduced himself, Abel, and another officer; all three officers were off camera. (Id. at 0:30-0:45.) Next, Corchado handed Defendant a written Miranda waiver,[5] which was not visible on camera, and Corchado, Abel, and Defendant had the following exchange that led to Defendant signing the waiver:

> Corchado: Before we start asking you and you telling us, I've got to advise you of your rights, obviously. You want to read it in English or do you want me to read it to you?
>
> Defendant: [Appears to start reading the waiver.]
>
> Corchado: Okay. These are your rights—I need you to read them and understand them and you tell me if you want to talk to us or not, basically is what's going on. Just so you know, this is so we can talk to you. I can't ask you any questions about today and you can't really tell me much about today unless you agree to talk to us. That's what this paper is. It protects you and it protects us.
>
> Defendant: But I'm not arrested or nothing, right?
>
> Corchado: No, we're just talking right now.[6]
>
> Defendant: Oh, alright.
>
> Corchado: If you understand the rights that you just read, I need you to initial here, and if you want to waive your rights and talk to us, I need you to initial there, and then your signature.
>
> Abel: You've seen TV, right?

---

[4] The Government provided copies of this video to Defendant on August 31, 2018 (see Aug. 31, 2018 Letter (Dkt. 18) at 1) and to the court on November 19, 2018.

[5] The form is not visible in the video, but the parties agree that it was a written Miranda waiver. (See Compl. ¶ 5; Def. Mem. at 3.)

[6] The Government has since acknowledged that Defendant was, in fact, under arrest during this interview. (See Compl. ¶ 5 (referring to this interview as being "post-arrest"); Gov't Mem. at 13 (same).)

3

Corchado: It's basically the same thing as on Law & Order or if you've seen any sort of police show.

Defendant: I'm so confused...

Corchado: This is just so we can talk to you.

Defendant: And if I don't sign it...

Corchado: We have to go through the process of printing you, fingerprint cards, photos, and all that stuff.

Abel: You don't get a chance to tell us your story.

Corchado: You don't get a chance to tell us your side.

Defendant: My side is two seconds, but...

Corchado: That's fine. But this is a formality before we can even talk about it.

Abel: And you can stop talking to us at any time. We just have to go through this process.

Corchado: I just need you to initial there if you understand and the same thing over here if you want to talk to us.

Defendant: [Appears to sign the form.]

Corchado: And then just your signature here.

Defendant: And it says I can stop whenever? [Appears to finish signing the waiver.]

Corchado: Yeah.

(Id. at 0:40-3:20; see also id. at 3:45-3:55 (showing Defendant initialing another part of the waiver).)

After signing the Miranda waiver, Defendant repeatedly denied that he knew about the Subject Package before it arrived at the Residence. (See id. at 9:40-11:00; 18:10-18:25.) He claimed that he and the package's addressee—who was akin to his girlfriend—were perplexed when it arrived. (See id. at 11:00-13:30.) He made these statements even after Corchado and

4

Abel accused him of lying and told Defendant that lying to a federal agent is a crime (see id. at 16:45-17:05, 32:10-32:20); threatened to tell the U.S. Attorney's office and state prosecutors[7] that Defendant had lied to them (see id. at 17:05-18:05, 29:55-30:40); claimed to have evidence suggesting that Defendant ordered the package from China (see id. at 15:10-16:20); and implied that Defendant's failure to confess his crime might expose the package's addressee to criminal liability (see id. at 32:20-33:00.) Defendant then left the interview room, and Corchado and Abel turned off the recording device. (See id. at 33:00-33:18; Sept. 11, 2018 Gov't Letter (Dkt. 20) at 1.)

The Government alleges that, shortly after his interview, Defendant asked to speak further with law enforcement and voluntarily returned to the interview room. (See Compl. ¶ 5; Sept. 11, 2018 Gov't Letter at 1; Gov't Mem. at 2-3, 15.) After returning, Defendant stated that he did not want the addressee of the package to be in trouble and acknowledged that he had not been truthful earlier. (Compl. ¶ 5.) Next, Defendant admitted that he paid about $3,200 for the Subject Package, which he believed contained molly, that he addressed the package to his companion and intentionally misspelled her name, and that he had planned to distribute the molly. (Id.) This confession was not video-recorded because law enforcement personnel did not turn on their recording device after Defendant returned to the room, but an agent who was present took handwritten notes. (See Sept. 11, 2018 Gov't Letter at 1.)

### B. Procedural History

Defendant was arraigned on August 3, 2018, before Magistrate Judge Marilyn D. Go. (Aug. 3, 2018 Min. Entry (Dkt. 3).) That same day, Defendant requested dismissal of the

---

[7] Defendant also admitted that he had been arrested "four or five times" previously on drug distribution charges, that he had been incarcerated in a New Jersey state prison for a year, and that, at the time of the video, charges for cocaine distribution were pending against him in a state court. (Video at 5:20- 8:15.)

5

complaint, asserting (as he does again now) that the Analogue Act is unconstitutionally vague. (Aug. 3, 2018, Letter (Dkt. 2).) Judge Go denied Defendant's motion and issued a temporary order of detention. (Aug. 3, 2018, Min. Entry.)

On August 6, 2018, the parties appeared for a bail hearing before Magistrate Judge James Orenstein, and Defendant once again moved to dismiss the complaint based on the Analogue Act's alleged vagueness. (Aug. 6, 2018 Min. Entry (Dkt. 7); Aug. 6, 2018 Appeal of Bail Determination (Dkt. 6).) Judge Orenstein denied the bail application, finding Defendant to be a danger to his community. (Aug. 6, 2018 Min. Entry.) Defendant appealed to District Judge Pamela K. Chen, who affirmed Judge Orenstein's denial of bail and, with respect to Plaintiff's motion to dismiss, sought the parties' briefing and scheduled oral argument for August 10, 2018. (Aug. 10, 2018 Min. Entry.) The Government submitted a brief in opposition (Aug. 10, 2018 Gov't Mem. (Dkt. 9)) as well as an affidavit from Corchado (Aff. of Sheldon Corchado (Dkt. 10).) In the affidavit, Corchado indicated that he had spoken to a chemist and a pharmacologist from the United States Drug Enforcement Administration ("DEA") who told him that N-Ethylpentylone—the substance Defendant allegedly ordered from China—is substantially similar to the chemical structure of Pentylone (a Schedule I controlled substance) and has a stimulant effect on the central nervous system that is substantially similar to or greater than Pentylone's stimulant effect. (Id.)

At the August 10, 2018 oral argument, Judge Chen denied Defendant's motion to dismiss for two reasons. (Hr'g Tr. at 2:16-5:23.) First, she found that it would have been premature for her to grant Defendant's as-applied challenge before the facts of the case had been developed through discovery. (Id. at 3:4-16.) Second, she found that the complaint alleged sufficient facts to establish probable cause that Defendant believed that what he was receiving was either a

6

controlled substance or an analogue of one. (Id. at 3:17-5:5.)[8] As to the second reason, Judge Chen found it significant that Defendant allegedly paid $3,200 for drugs that he believed were molly and falsified the name of the drug's recipient to conceal his identity. (Id. at 5:6-16.)

On August 16, 2018, a grand jury returned a two-count indictment charging Defendant with conspiring to distribute and possess with the intent to distribute the controlled substance analogue N-Ethylpentylone, and attempted possession with the intent to distribute N-Ethylpentylone. (Indictment.) Defendant's case was then assigned to this court. (See Aug. 24, 2018 Scheduling Order.) On October 10, 2018, Defendant asked the Government to provide a bill of particulars explaining why the Government believes N-Ethylpentylone is substantially similar to Pentylone in both chemical structure and pharmacological effect. (Oct. 10, 2018 Def. Letter (Dkt. 32-1).) On October 19, 2018, Defendant moved to dismiss the indictment and suppress the statements he made during the interrogation. (Def. Mot.) On November 7, 2018, the Government filed its opposition brief, arguing that Defendant was not entitled to a bill of particulars, that the law-of-the-case doctrine supports denial of Defendant's motion to dismiss, and that the record does not support Defendant's claim that his post-arrest statements were unlawfully coerced. (Gov't Mem. at 5-17.) Defendant replied on November 13, 2018. (Def. Reply.) The court held oral argument on November 19, 2018, at which the Government provided the Video to the court.

## II. MOTION TO DISMISS

### A. Legal Standard for Vagueness Challenges

The void-for-vagueness doctrine is derived from the Due Process Clause contained in the Fifth Amendment to the Constitution. See, e.g., Johnson v. United States, 135 S. Ct. 2551, 2557

---

[8] Judge Chen also handed the parties a list of various cases that supported her two reasons for denying Defendant's motion to dismiss. (See Hr'g Tr. at 2:22-3:3; List of Cases (Dkt. 12).)

(2015). A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." Id. at 2556 (citing Kolender v. Lawson, 461 U.S. 352, 357-58 (1983)). "'It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined' on an as-applied basis." Id. at 2580 (Alito, J., dissenting) (quoting United States v. Mazurie, 419 U.S. 544, 550 (1975)); see United States v. Whittaker, 999 F.2d 38, 42 (2d Cir. 1993) (same); see also United States v. Taleb-Jedi, 566 F. Supp. 2d 157, 180 (E.D.N.Y. 2008) ("[A] party who has notice of the criminality of her own conduct from the challenged statute may not attack it by arguing that the statute does not give fair warning to other conduct not at issue.").

**B. The Analogue Act**

The Analogue Act extends the reach of the Controlled Substances Act ("CSA"), 21 U.S.C. § 844(a), to analogous substances that do not appear in the CSA's drug schedules. 21 U.S.C. § 813. To qualify as a "controlled substance analogue," the drug or substance in question (1) must be "substantially similar" to a Schedule I or II controlled substance in its "chemical structure" and (2) must have, or be represented or intended to have, "a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than" the effect of a Schedule I or II controlled substance. 21 U.S.C. § 802(32)(A). As to mens rea, "the [G]overnment must show that the defendant knew the drug he possessed either (1) had both of these features, or (2) was controlled by the CSA or Analogue Act." United States v. Makkar, 810 F.3d 1139, 1143 (10th Cir. 2015) (Gorsuch, J.) (citing McFadden v. United States, 135 S. Ct. 2298, 2305 (2015)).

Courts have yet to reach a consensus on what "substantial similarity" means in the context of the Analogue Act. See Makkar, 810 F.3d at 1143 ("It's an open question, after all, what exactly it means for chemicals to have a 'substantially similar' chemical structure—or

8

effect."). A jury typically decides, with the aid of expert witnesses, whether a substance qualifies as a controlled substance analogue. See, e.g., United States v. Turcotte, 405 F.3d 515, 523 (7th Cir. 2005) (jury found that GBL was an analogue of gammahydroxybutyric acid ("GHB")), abrogated on other grounds by United States v. Novak, 841 F.3d 721, 729 (7th Cir. 2016); United States v. Washam, 312 F.3d 926, 929 (8th Cir. 2002) (jury found that butanediol was an analogue of GHB).

While the Second Circuit "recognize[s] that making criminality depend on the 'substantial similarity' of a substance to an expressly prohibited substance inevitably involves a degree of uncertainty," United States v. Demott, 906 F.3d 231, 237 (2d Cir. 2018), it has repeatedly upheld the Analogue Act against vagueness challenges. Id. at 237-39; United States v. Ansaldi, 372 F.3d 118, 123-24 (2d Cir. 2004); United States v. Roberts, 363 F.3d 118, 127 (2d Cir. 2004). Other circuit courts have uniformly rejected such challenges as well. See Turcotte, 405 F.3d at 531-32 (collecting cases); see also United States v. Carlson, 810 F.3d 544, 550-51 (8th Cir. 2016) (rejecting a vagueness challenge to the Analogue Act); United States v. Lane, 616 F. App'x 328, 329 (9th Cir. 2015) (same). In fact, since the Analogue Act was passed in 1986, the court is aware of only one case in which a court has upheld an as-applied vagueness challenge to the Analogue Act. See United States v. Forbes, 806 F. Supp. 232, 238-39 (D. Colo. 1992).

## C. Discussion

Defendant argues that the Analogue Act is unconstitutionally vague as applied to him because, before his arrest, he had no reliable way of determining whether N-Ethylpentylone might qualify as a controlled substance analogue. (Def. Mem. at 8.) In opposing Defendant's motion, the Government first relies on the law-of-the-case doctrine (Gov't Mem. at 9), which states that "when a court has ruled on an issue, that decision should generally be adhered to by

9

that court in subsequent stages in the same case," United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009) (citation and internal quotation marks omitted). According to the Government, this doctrine should motivate the court not to upset Judge Chen's earlier rejection of Defendant's motion to dismiss the complaint against him. (Gov't Mem. at 9-12.) In addition, the Government repeats the arguments it made before Judge Chen in August, which were that the facts of this case indicate that Defendant believed that the substance he received was prohibited and that other courts have almost uniformly rejected vagueness challenges to the Analogue Act. (Gov't Mem. at 11-12; Aug. 10, 2018 Gov't Mem.)

While the court believes that the law-of-the-case doctrine does not apply in this instance,[9] the court nevertheless denies Defendant's motion to dismiss because the facts of this case establish probable cause that Defendant believed that the Subject Package contained a substance that was either substantially similar to a controlled substance or prohibited by the CSA or Analogue Act. See McFadden, 135 S. Ct. at 2305 (explaining how the Analogue Act's scienter requirement can be satisfied). According to the complaint, Defendant admitted to the police that he believed the package contained molly (which is a controlled substance), that he paid $3,200 for it, and that he falsified the name of the package recipient (presumably to conceal Defendant's identity). (Compl. ¶ 5.) This evidence suggests strongly that he had "notice of the criminality of [his] conduct." See Taleb-Jedi, 566 F. Supp. 2d at 180. Nothing about this case distinguishes it

---

[9] The court rejects the Government's law-of-the-case argument for two reasons. First, a ruling on a civil complaint generally does not bind a court with respect to a subsequent amended complaint. See Colin v. Keen, 900 F.3d 63, 68 n.1 (2d Cir. 2018) (holding that, when a plaintiff files an amended complaint, she is not bound to adverse rulings regarding her previous complaint); Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1043 (9th Cir. 2018) (ruling that law-of-the-case doctrine did not bar consideration of a motion to dismiss an amended complaint based on the district court's prior ruling on a motion to dismiss the original complaint). Thus, it should not bind a court with respect to a subsequent indictment. Second, Judge Chen denied Defendant's motion in part because it would have been premature to grant an as-applied challenge before the facts had been developed through discovery. (Hr'g Tr. at 3:4-16.) Now that discovery is complete, this justification no longer applies.

meaningfully from the various cases in which the Second Circuit and other courts have rejected vagueness challenges to the Analogue Act. See, e.g., Demott, 906 F.3d at 237-39; Ansaldi, 372 F.3d at 123-24; Roberts, 363 F.3d at 125-26. While there may be cases in which the Analogue Act is unconstitutionally vague as applied to a particular defendant, this is not one of them. Accordingly, the court denies Defendant's motion to dismiss.

## III. MOTION FOR A BILL OF PARTICULARS

### A. Legal Standard

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him." U.S. v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted). The purpose of a bill of particulars is to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." Id. (citations omitted). The decision of whether to order the filing of a bill of particulars is within the discretion of the district court. United States v. Barnes, 158 F.3d 662, 665-66 (2d Cir. 1998). A bill of particulars is warranted "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (citation and internal quotation marks omitted).

### B. Discussion

Defendant seeks an order compelling the Government to provide a bill of particulars explaining why it believes N-Ethylpentylone is substantially similar to Pentylone. (Def. Reply at 5-8.) As the Government contends, Defendant is essentially asking it to disclose its expert evidence—i.e., the information provided to the government by a DEA chemist and DEA pharmacologist who would testify as expert witnesses at trial. (Gov't Mem. at 6-9.) This would

be improper because the bill of particulars is not meant to enable a defendant to "obtain a preview of . . . the government's evidence before trial" or "to learn the legal theory upon which the government will proceed." United States v. Kyongja Kang, No. 04-CR-87 (ILG), 2006 WL 208882, at *1 (E.D.N.Y. Jan. 25, 2006); see also United States v. Coffey, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) (denying a motion for a bill of particulars "in light of the ample notice and specificity provided by the indictment and additional evidence and information supplied"). Here, Defendant already knows the "specific acts of which he is accused," Walsh, 194 F.3d at 47: conspiring and attempting to buy N-Ethylpentylone with the intent of distributing it. (See Indictment ¶¶ 1-2; see also Compl. at ¶¶ 2-5.) Thus, the court denies his request for a bill of particulars.

## IV. MOTION TO SUPPRESS DEFENDANT'S POST-ARREST STATEMENTS

Defendant moves to suppress the statements he made to law enforcement at JFK following his arrest,[10] contending that any supposed waiver of his Fifth Amendment rights was invalid. (Def. Mem. at 17-20.) Pointing to the video of his interview, Defendant argues that Corchado and Abel coerced him into waiving his Miranda rights with two misleading statements: (1) they falsely assured Defendant that he was not under arrest; and (2) they told Defendant that, if he did not sign the waiver, they would have to "go through the process of printing you, fingerprint cards, photos and all that stuff" and he would not get the chance to tell them his story. (Id.)

Defendant also requests an evidentiary hearing (a "suppression hearing") to resolve four supposed factual issues related to his motion to suppress: (1) whether he was read his Miranda

---

[10] Defendant seeks to suppress both the statements captured in the video recording as well as the admissions he allegedly made after returning to the interview room, which were not video-recorded.

rights when he was arrested; (2) whether he was made aware that he was under arrest before being brought into the interview room at JFK; (3) whether he made a second statement in the interview room that the agents failed to video-record; and (4) whether, during his second statement, he admitted to ordering a package of molly from China. (Def. Reply at 9.) For the following reasons, the court denies Defendant's motion without a hearing.

### A. A Suppression Hearing is Not Warranted

#### 1. Legal Standard

Where a defendant sets forth specific facts that raise a material dispute as to whether he knowingly and voluntarily waived his Miranda rights, the district court must hold a suppression hearing. See United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998); United States v. Perryman, No. 12-CR-123 (ADS), 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013) (citing United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005)). "Courts in this [c]ircuit have repeatedly denied motions to suppress without a hearing where defendants have failed to provide affidavits alleging facts based on personal knowledge." Perryman, 2013 WL 4039374, at *6 (citations and internal quotation marks omitted); see id. (collecting cases).

#### 2. Discussion

In this case, a suppression hearing is not warranted because Defendant has "not submitted an affidavit based upon his personal knowledge, rebutting the Government's version of events" as to any of the four supposed factual issues he identifies in his reply brief (see Def. Reply. at 9). See Perryman, 2013 WL 4039374, at *6; see also United States v. Aparo, 221 F. Supp. 2d 359, 369 (E.D.N.Y. 2002) (denying a motion to suppress where the defendant had "not submitted an affidavit alleging facts which would require the suppression of statements if those facts were proved at a hearing"). Moreover, Corchado and Abel's allegedly coercive conduct is depicted fully in the video of Defendant's interview, copies of which Defendant and the court received.

13

(See Video.) Thus, no hearing is required to ascertain what Corchado and Abel may have done to induce Defendant to waive his Miranda rights; the court can rely on the video.

### B. Defendant Knowingly and Voluntarily Waived His Miranda Rights

1. Legal Standard

"A statement made by the accused 'during a custodial interrogation is inadmissible at trial unless the prosecution can establish [by a preponderance of the evidence] that the accused in fact knowingly and voluntarily waived Miranda rights when making the statement.'" United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) (alteration adopted) (quoting Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)); see United States v. Shehadeh, 940 F. Supp. 2d 66, 71 (E.D.N.Y. 2012) (citing United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996)) (setting forth preponderance-of-the-evidence requirement). For a waiver to have been "knowing," it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). For the waiver to have been "voluntary," it must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. (quoting Moran, 475 U.S. at 421)).

A signed waiver form is strong, but not conclusive, proof that a defendant knowingly and voluntarily waived his Miranda rights. See Taylor, 745 F.3d at 23 (citing Plugh, 648 F.3d at 127-28); Shehadeh, 940 F. Supp. 2d at 71 (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)). Even where a defendant has signed a waiver form, a post-arrest statement is considered involuntary where "the defendant's will was overborne by [coercive law enforcement] conduct." United States v. Haak, 884 F.3d 400, 409 (2d Cir. 2018) (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)); see also Anderson, 929 F.2d at 98-102 (ruling that a defendant's

14

waiver was involuntary, even where the defendant signed a waiver form, because law enforcement used "false and/or misleading" statements to coerce him).

In assessing whether a defendant's will was overborne, courts examine the totality of the surrounding circumstances, usually focusing on "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Haak, 884 F.3d at 409; see Taylor, 745 F.3d at 23-24.

### 2. Discussion

Here, the totality of the circumstances indicates that Corchado and Abel's statements to Defendant, while deceptive, did not overbear his will. The first factor—Defendant's characteristics—does not cut in favor of or against a finding of voluntariness. On the one hand, Defendant is an adult, there is no evidence that he lacks maturity or intelligence, and he has ample experience with state criminal justice systems (see Aug. 10, 2018 Hr'g Tr. 13:24-14:18; Video at 5:20-8:15), suggesting he may have been familiar with his Miranda rights and might be less easily intimidated by law enforcement. See Haak, 884 F.3d at 414-15 (considering a defendant's criminal history, maturity, and intelligence in assessing voluntariness of statements); United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) (same); Green v. Scully, 850 F.2d 894, 901-02 (2d Cir. 1988) (same). On the other hand, there is no evidence that he has previously received Miranda warnings. See Anderson, 929 F.2d at 99 (stating that a defendant's extensive criminal history, including 12 arrests and 11 guilty pleas, did not support voluntariness because there was no evidence that the defendant had previously received Miranda warnings or that he had waived his Miranda rights). Additionally, he did not appear to understand that he was under arrest and expressed confusion before signing the waiver. (See Video at 0:40-2:30.) Furthermore, he had never faced federal criminal charges, and Corchado emphasized to him repeatedly that the federal criminal justice system is more daunting than its state equivalents (see

15

Video at 16:45-17:05, 17:05-18:05, 29:55-30:40, 32:10-32:20), which likely placed more pressure on him to cooperate.

Similarly, the second factor—the conditions of Defendant's interview at JFK—does not point in either direction. The interview took place in a small, nondescript room at JFK. Cf. Shehadeh, 940 F. Supp. 2d at 73 ("'The fact that the questioning took place in close quarters is not significant in determining whether' [the defendant's] waiver was voluntary." (quoting Anderson, 929 F.2d at 99)). Defendant was questioned while in custody, which imposes "compelling pressures," Dickerson v. United States, 530 U.S. 428, 440 (2000), but he was not physically restrained, cf. Haak, 884 F.3d at 415 (deeming confession voluntary where, inter alia, the defendant was unrestrained), and was allowed to leave the room after he denied culpability. He then chose to return to the interview room and admit that he had ordered the Subject Package, explaining that he did not want to expose his companion (the package's recipient) to trouble. (Compl. ¶ 5.)

In this case, the third factor—law enforcement conduct—is determinative. See Haak, 884 F.3d at 409 (stating that "coercive police activity is a necessary predicate to holding a confession constitutionally involuntary" (citation and quotation marks omitted)). Understandably, Defendant relies on Anderson, in which the Second Circuit affirmed the suppression of a defendant's post-arrest statement where a government agent had told him several times, in sum and substance, that "'this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us,'" 929 F.2d at 97 (alterations in original). (Def. Mem. at 17-20.) Suppression was appropriate

in Anderson due to the "false and/or misleading" nature of the agent's explicit, repetitive advice that asking for a lawyer would foreclose cooperation and its concomitant benefits. Id. at 100-02.

"There is," however, "a line separating tolerable deception from unconstitutional coercion." Shehadeh, 940 F. Supp. 2d at 74 (citing Illinois v. Perkins, 496 U.S. 292, 297 (1990), and Anderson, 929 F.2d at 100). Corchado and Abel's conduct did not cross that line. Corchado's statement that Defendant was not under arrest and that they were "just talking right now" was false, but it was brief and there is no indication that Defendant would have acted differently if he did know that he was under arrest. See United States v. Williams, No. 16-CR-6014, 2016 WL 6311805, at *7 (W.D.N.Y. Oct. 26, 2016), report and recommendation adopted, 2016 WL 6952307 (W.D.N.Y. Nov. 28, 2016) (holding that an officer's misrepresentation that a defendant was not under arrest did not render the defendant's waiver involuntary); United States v. Anthis, No. 11-CR-10195, 2013 WL 39077, at *6 (D. Mass. Jan 3, 2013) (finding that defendant's waiver was voluntary, despite the police falsely telling him he was not under arrest, because, inter alia, the agent's comments were brief and "[t]here is no evidence that defendant relied on those statements in deciding to waive his rights"); see also Haak, 884 F.3d at 409 ("[A] finding that [law enforcement] conduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render [a post-arrest statement] involuntary." (quoting Anderson, 929 F.2d at 99)). In fact, several minutes after saying that Defendant was not under arrest, Corchado told Defendant that "[things are] getting a little serious" and that Defendant faced severe consequences (Video at 16:20-16:45), which should have made clear to Defendant the gravity of his predicament—yet Defendant continued talking and proceeded to admit that he had ordered the package (see Compl. ¶ 5).

Corchado and Abel also told Defendant that if he did not waive his <u>Miranda</u> rights, they would "have to go through the process of printing you, fingerprint cards, photos, and all that stuff," and he would not get the "chance to tell us your story." This was arguably misleading because Defendant would have more opportunities to cooperate with law enforcement in the future. And unlike Corchado's comment about Defendant not being arrested, this statement seems to have helped convince Defendant to sign the waiver form and begin answering the agents' questions. (<u>See</u> Video at 2:00-3:00.) Nevertheless, these statements were too ambiguous to be unconstitutionally coercive. <u>See</u> <u>Haak</u>, 884 F.3d at 410 (stating that courts do not "readily imply an improper . . . misrepresentation from vague or ambiguous statements by law enforcement officers"). It is possible Corchado and Abel were suggesting that Defendant would not get the chance to tell them his story before going through the booking process—which was true. They also said that Defendant would not get the chance to talk to "us"—<u>i.e.</u>, Corchado and Abel—not to law enforcement in general. In other words, unlike in <u>Anderson</u>, the agents did not explicitly or repeatedly advise Defendant that asserting his <u>Miranda</u> rights would foreclose cooperation in the future. <u>See</u> <u>Shehadeh</u>, 940 F. Supp. 2d at 75 (finding agent's advice to a defendant that asking for a lawyer would limit his ability to talk to the agent was a "far cry from" the unconstitutional coercion in <u>Anderson</u>). Furthermore, Corchado and Abel did not make any false promises of leniency or any other benefit, which can overbear an interviewee's will. <u>See</u> <u>Haak</u>, 884 F.3d at 410.

In sum, having considered the totality of the surrounding circumstances, the court finds that Corchado and Abel's conduct did not overbear Defendant's will. Accordingly, the court concludes that Defendant knowingly and voluntarily waived his <u>Miranda</u> rights, and denies his motion to suppress his post-arrest statements.

## V. CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motions to dismiss the case (Dkt. 26), to compel the Government to provide a bill of particulars (Dkt. 32), and to suppress his post-arrest statements (Dkt. 26).

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
January 3, 2019

NICHOLAS G. GARAUFIS
United States District Judge